**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

<u>**John Balsamo**</u>

    **v.**                                    Case No. 10-cv-500-PB
                                       Opinion No. 2012 DNH 048

<u>**University System of**</u>
<u>**New Hampshire, et al.**</u>

<u>**MEMORANDUM AND ORDER**</u>

    John Balsamo was fired in September 2007 after working as a maintenance technician for the University of New Hampshire ("UNH") Housing Office for slightly over one year.  He brings suit against UNH, the University System of New Hampshire ("USNH"), the President of UNH, and three UNH employees. Balsamo claims that UNH and USNH are liable for breach of contract because they terminated him without adhering to the policies governing the termination process.  Balsamo also argues that defendants violated his constitutional right to procedural due process.  Defendants move for summary judgment, and for the reasons provided below, I grant defendants' motion.

## I.  BACKGROUND

### A.  Facts

#### 1.  Hiring & Orientation

On August 3, 2006, Balsamo was offered the position of General Maintenance Technician at the UNH Housing Office.  The offer letter stated that his appointment would be full-time. Offer Letter, Doc. No. 14-3.  Aside from noting that his employment would begin with an "introductory period" of up to six months, the letter did not include a durational term of employment.  Id.  Balsamo began work on August 14.  Welcome Letter, Doc. No. 14-5.

Balsamo received a welcome letter on August 22 that contained a packet of materials detailing benefits programs as well as an invitation to an August 28 orientation session.  Id. At or before the orientation session, which he attended, he received a copy of the 2006 edition of the USNH Operating Staff Handbook ("Handbook").  VanHorn Aff. ¶ 5, Doc. No. 14-6.  He read through the Handbook, and was aware of its statement that USNH's online Policy Manual included more specific information about the University's policies.  Balsamo Dep. at 21-23, Doc. No. 14-7.

At some point that month, Balsamo also received a packet on discrimination and harassment that included a memorandum, two

2

flyers, and UNH's Discrimination and Discriminatory Harassment
Policy [hereinafter Discrimination Policy].  Discriminatory
Harassment Packet, Doc. No. 14-9.  Also occurring at some
unspecified time around the start of his employment, Balsamo was
advised that the terms of his employment would be governed by
USNH and UNH policies.  Balsamo Aff. ¶ 2, Doc. No. 16-7.

**2.   Policies, Documents, and Disclaimers**

**(a)  Operating Staff Handbook**

The Operating Staff Handbook given to Balsamo at or before
his orientation session contains a preface that reads, in its
entirety:

> This handbook is describing employment conditions and
> providing an overview of policies and practices for
> status Operating Staff of [USNH].  Please note that
> the information contained in this handbook is intended
> as a guideline only.  While the handbook summarizes
> plans, programs, and policies, the exact terms of the
> written documents for these plans, programs, and
> policies take precedent [sic].  USNH reserves the
> right to make changes to this handbook and any such
> plans, programs, and policies at any time without
> prior notice.  More specific information is available
> in USNH's online Policy Manual, which may be accessed
> through your campus Human Resources web page, or at
> www.usnholpm.unh.edu.  This handbook is not and should
> not be interpreted as a contract of employment between
> any current Operating Staff member or former Operating
> Staff member and USNH.  If you have questions about
> any of the information in this handbook, you are
> encouraged to consult your campus Human Resources
> Office or the University System Human Resources
> Office.

Handbook, Doc. No. 14-18 at 2.

The Handbook also contains a section titled "Involuntary Termination," which includes a subsection titled "Performance Based Reasons."   The paragraph under that subsection reads:

> If your job performance is not meeting expectations, your supervisor will provide you with verbal and written notification.  This notification will include a description of the expected improvements and a time frame in which to achieve them.  If your job performance does not improve, your employment will be terminated.  **The University System reserves the right to bypass these steps and terminate a staff member immediately if, in its sole judgment, the nature of the situation justifies immediate termination.**  In either case, you will receive a letter of termination describing the reason for the termination, the date on which your employment will end, and the procedure for filing a grievance.

Id. at 9-10 (emphasis added).

### (b)  Online Policy Manual

The online Policy Manual ("OLPM") referenced in the Handbook's preface contains a number of policies in various sections that are relevant to employment and to termination procedures.  One provision in the Appointments and Employment Relationships Section[1] states, "A status appointment[2] is normally reserved for those with continued employment

---

[1] Defendants have moved to strike Balsamo's exhibit that contains this section of the OLPM.  For reasons elaborated in note 9, infra, I deny that motion as moot.

[2] Balsamo asserts that he was a full-time status employee.  P.'s Opp. to Summ. J. at 3, Doc. No. 16-1.

expectations which, however, shall not be construed to imply a commitment or a contractual obligation to provide employment." Employment Section § 6.2.4.1, Doc. No. 16-5. Another provision in that section reads, "Appointments are based on a Fiscal Year, which is 12 consecutive months, . . . or on an academic year of approximately nine months[.]"  Id. § 6.2.5.

The Termination Section includes a number of provisions concerning the involuntary termination of an employee.  One provision states that poor performance can be a reason for involuntary discharge, and notes that an employee may be terminated after evaluative steps and constructive discipline are unsuccessful in remedying the problems in performance. Termination Section § 9.8.4, Doc. No. 14-12.  Another grounds for termination is destructive or detrimental action.  Id. § 9.10.1.  The provision explaining that category -- which includes serious crimes, insubordination, and grievous acts -- states that a "staff member may be terminated immediately without further notice" if "the staff member's actions are so destructive or detrimental that they cannot be tolerated[.]" Id. § 9.10.1.  The provision on grievous acts indicates that an "employee may be terminated for serious grievous acts of violation of policy . . . including[,] but not limited to[,] guilt in sexual harassment, failure to comply with substance

abuse and/or safety policies, or the conflict of interest policy." Id. § 9.10.1.3.

The OLPM's Discrimination and Discriminatory Harassment Section [hereinafter Discrimination Section] deals with discriminatory and harassing behaviors and the process for handling allegations of offending conduct.  Discrimination Section, Doc. No. 14-16.  One subsection details UNH's policy regarding the formal complaint process, a process to be used as an alternative when informal resolution is unsuccessful.  Id. § 5.9.1.  According to that subsection, faculty and staff have up to sixty days from the date of an incident to file a formal complaint, and students have twelve months to file after an incident.  Id. § 5.9.2.  An administrator is to make a preliminary assessment, and the complaint process will proceed if the administrator determines discriminatory harassment may have occurred.  Id. § 5.9.4.  An investigation commences when a complainant submits a written, signed complaint to the Affirmative Action and Equity Office, and the Office then "provide[s] a copy of the complainant's signed complaint to the accused person, together with information as to the policy." Id. § 5.9.5.  The accused is to be promptly interviewed, and "[t]hereafter, a reasonable effort will be made to investigate the disputed facts of the case, using corroborating sources of

information (including witnesses) identified by the complainant and the accused." Id. If a resolution is not possible, the Director of the Affirmative Action and Equity office provides the appropriate administrator with its findings and conclusions, along with a recommendation for action. Id. 5.9.7. The administrator then renders a judgment. Id. An accused who is unsatisfied may appeal the judgment through grievance procedures. Id. § 5.9.8.

In addition to the policies enumerated in the various sections of the OLPM, an individual browsing through the online manual would also come across two disclaimers. The OLPM menu page contains the following statement:

> This On-Line Policy Manual contains policies adopted by the University System Board of Trustees, the Presidents' Council (also known as Administrative Board), the Chancellor's office (also know[n] as the University System Administration), and each of the USNH institutions . . . . We have published only those policies which the promulgating body determined should be distributed through this mechanism. Although every effort has been made to make this manual accurate and up-to-date, we can not [sic] guarantee that it is completely accurate. . . .
>
> Please also note that this compilation of policies is presented solely for the convenience of the user and is not a contract of employment and cannot be construed to establish rights beyond those provided for in the official and current policies of USNH and its institutions. The policies published in this manual are subject to amendment and repeal at any time and without notice.

OLPM Main Menu, Doc. No. 16-6.

In addition to that statement on the menu page, each web-page that contains a given OLPM section also includes a disclaimer at the top of the page.  That disclaimer reads: "These policies may be amended at any time, do not constitute an employment contract, and are provided here only for ease of reference and without any warranty of accuracy."  See, e.g., Affirmative Action Section, Doc. No. 14-10; Termination Section, Doc. No. 14-12.

### (c)  Hardcopy of OLPM Section

In addition to being directed to the online OLPM, around the time he was hired Balsamo also received a hardcopy of UNH's Discrimination Policy in a packet on discrimination.  The hardcopy is titled "Policy," and appears to be a verbatim reproduction of the section of the OLPM that bears the same title; it is also organized and numbered in the same manner as its OLPM cognate.  Compare Discrimination Section, Doc. No. 14-16, with Discrimination/Harassment Packet at 8-18, Doc. No. 14-9.  Although the document given to Balsamo does not contain either disclaimer present on the OLPM, it does contain the following statement at the top of the first page: "The section references in this policy correspond to the University System of New Hampshire On-Line Policy Manual, which contains this

8

Discrimination and Discriminatory Harassment Policy as adopted
by the University of New Hampshire.  This policy may be found
on-line at http://usnholpm.unh.edu/UNH/V.Pers/[.]"
Discrimination/Harassment Packet at 8, Doc. No. 14-9.

### 3.  <u>Employment & Termination</u>

A few months after Balsamo started work, two female
employees approached an administrator with concerns about
Balsamo's conduct, explaining that his manner of interacting
with them had made them uncomfortable.  Meehan Aff. ¶ 4, Doc.
No. 14-2; Meehan Letter to Balsamo, Doc. No. 14-38.  A letter
jointly signed by Balsamo and a UNH administrator stated that
although Balsamo had not intended to make the female employees
uncomfortable, he agreed to "end [] the behaviors in question"
and treat students and employees with appropriate respect.
Meehan Letter to Balsamo, Doc. No. 14-38.

Approximately seven months later, in June 2007, an
individual sent an email about Balsamo through the UNH
"ReportIt!" online portal, a system established to enable
members of the university community to submit confidential
reports on issues of bias, prejudice, and discrimination.
Sorrentino Aff. ¶¶ 5, Doc. No. 14-20.  The email attributed to
Balsamo various statements denigrating the physical state of a
student apartment complex and disparaging its residents.  <u>Id.</u>;

9

Warning Letter at 1, Doc. No. 14-22.  In a meeting with UNH administrators, Balsamo admitted that he "could have seen [himself] saying these things," but he contended that he was entitled to speak his mind and he had not intended residents of the apartment complex to hear him.  Warning Letter at 1, Doc. No. 14-22.  At the meeting, UNH officials also took the time to address separate issues that had caused concern about Balsamo's conduct.  They reprimanded Balsamo for an incident where he intentionally "burned out" the tires in a University pick-up truck and then dissembled when confronted with the evidence, and for offhand comments he had made to student workers about smoking marijuana.  Id. at 2-3; Williams Aff. ¶ 5, Doc. No. 14-8.  A jointly signed letter summarized the meeting, and concluded with a warning that Balsamo could face termination if he engaged in any additional inappropriate conduct.  Warning Letter at 4, Doc. No. 14-22.

Just a few months later, in September 2007, UNH received troubling reports from students and university employees about Balsamo's conduct.  Williams Aff. ¶ 9, Doc. No. 14-8.  After investigating the reports and determining that Balsamo had committed serious infractions, UNH administrators called in Balsamo for another meeting.  Id. ¶ 12-13.  At the September 25

meeting, Balsamo contested the underlying facts and the severity of the matters presented.  Id. ¶ 16.

The day after the meeting, UNH administrators telephoned Balsamo and read him a letter entitled "Letter of Involuntary Termination."  Id. ¶ 18.  The letter stated that although Balsamo denied many of the accusations, much of his inappropriate conduct had been corroborated by other evidence. Termination Letter at 2, Doc. No. 14-27.  The letter detailed various incidents involving Balsamo in addition to those that were the subjects of prior meetings.  For example, the letter stated that Balsamo made "[d]erogatory, sexually explicit verbal remarks [] about female students [] and to female co-workers"; his non-verbal behavior repeatedly caused female employees discomfort; he would openly discuss his current marijuana use with students; he got "wasted" with a student and expressed interest to get high with a resident; he made inappropriate comments about his coworkers' attire, including a "remark that a coworker was wearing green panties with white pants"; he made jokes with racial undertones, including a "racist joke about an Indian with cancer being referred to as a 'chemosabi'"; he accessed dating websites for extended periods of time during work hours; he would respond differently to maintenance requests from female students; he used "foul language in the presence of

11

other employees and apartment residents" and at least once
directed profanities at a male employee; and he was known as
having a "lead foot" when driving UNH vehicles and had lied to
his supervisors about being pulled over for speeding.  Id. at 1-
2.

The letter recounted the "past corrective action
discussions" involving Balsamo, and stated that his "repeated
and unwelcome conduct violates the University's strong
commitment to maintaining learning and work environments [] free
from discriminatory harassment and our department's standards of
performance and conduct."  Id. at 3-4.  Accordingly, the letter
notified Balsamo that his employment with UNH was terminated.
Id. at 4.  It also directed Balsamo to refrain from returning to
UNH property without permission, and from initiating contact
with any employee or resident about the matter.  Id.

**4.  Grievance Hearing**

On October 11, Balsamo filed a grievance form pursuant to
UNH's "FAIR" grievance procedure, and cited three provisions of
UNH's policies that had been violated when UNH involuntarily
terminated his employment.  FAIR Notice Form, Doc. No. 14-28.
He cited the provision in the Termination Section of the OLPM
governing involuntary termination due to performance, the
provision in that Section governing involuntary termination for

12

destructive or detrimental action, and the entire Discrimination
Section.  Id.; Termination Section, Doc. No. 14-12;
Discrimination Section, Doc. No. 14-16.

Vilmarie Sanchez, a UNH Human Resource Partner, wrote back
and asked Balsamo to explain, in writing, how the policies
Balsamo cited had been violated.  Sanchez Letter, Doc. No. 14-
29.  Along with her letter, Sanchez sent paper copies of the
OLPM policies Balsamo alleged had been violated.  Id.  The
copies of those sections were in formats identical to those on
the OLPM, but they did not contain any of the disclaimers
present on the OLPM.  See id.

On October 22, Balsamo responded by letter.  He contended
that the University had violated his rights and its own internal
policies by: failing to sufficiently investigate and adjudicate
the complaints of discriminatory harassment against him; firing
him for conduct not rising to the level of discriminatory
harassment or serious grievous acts; and failing to administer
step discipline if the reason for his termination was based on
performance.  Balsamo Letter, Doc. No. 14-30.

On November 29, Sanchez wrote to Balsamo with information
about the grievance hearing.  Grievance Letter, Doc. No. 14-31.
The letter noted that the hearing on his grievance would be held
on December 13 and listed the three individuals who would sit on

13

the grievance panel to hear his case.  Id. at 1.  The
individuals comprising the panel were UNH staff members that had
no connection to the parties or events involved.  Balsamo Dep.
at 78-79, Doc. No. 14-7.  Sanchez's letter named three witnesses
that would be called in response to Balsamo's grievance
complaint and instructed Balsamo to provide notice by December 6
if he planned to call witnesses or to have a non-attorney
advocate present at the hearing. Grievance Letter at 2, Doc. No.
14-31.

Balsamo responded by letter dated December 5.  He explained
that he would be unable to call any witnesses at the hearing
because he would not be able to present a coherent defense
without first speaking to the witnesses he would ask to testify,
and UNH had instructed him to refrain from contacting its
employees.  Reply to Grievance Letter at 1, Doc. No. 14-32.
Balsamo also requested the opportunity to speak with the
witnesses identified by the opposing side and to receive copies
of any statements they had made.  Id.

On December 12, the day before the hearing, Sanchez
addressed Balsamo's concerns in a letter.  December 12 Letter,
Doc. No. 16-11.  She explained that she had been sensitive to
the possibility that Balsamo would wish to call witnesses, and
had previously offered to facilitate contact with any UNH

14

employee who Balsamo thought might testify on his behalf.  Id.
She clarified that she had not intended that she would speak to
those potential witnesses herself, but she would have enabled
Balsamo to communicate with them.  Id.  Sanchez noted that
Balsamo had not offered any names, and so she had not contacted
anybody on his behalf.  Id.  Balsamo contradicts her account,
however, claiming that he did provide Sanchez with the names of
several student workers whom he wanted to call as witnesses, and
that Sanchez never contacted them.  Balsamo Dep. at 85, Doc. No.
14-7.  Attached to her letter, Sanchez provided Balsamo with
written statements from the witnesses who would speak against
him.  December 12 Letter at 3, Doc. No. 16-11.  She informed
Balsamo that although he had not had the chance to speak with
them, "it is at the hearing you will have the opportunity to
speak to and to question the respondents and the witnesses."
December 12 Letter at 3, Doc. No. 16-11.

    The grievance hearing occurred as scheduled on December 13,
and two former colleagues of Balsamo testified.  Their testimony
was consistent with the statements that had been provided to
Balsamo, and focused on Balsamo's comments about drug use and
his repeated, inappropriate conduct in regard to female
students.  See Balsamo Dep. at 86-87, Doc. No. 14-7; Switzer's
Statement, Doc. No. 14-33; Tripp's Statement, Doc. No. 14-34.

15

In addition to the incidents listed in the termination letter, the witnesses noted further troublesome behavior by Balsamo. For example, one witness stated that Balsamo would regularly tell his coworkers, in graphic terms, that he would like to sleep with various female students, and that Balsamo would plan his maintenance schedule so that he would arrive at female students' dorm rooms as they came out of the shower in the morning.  See Tripp's Statement, Doc. No. 14-34.

The panel ruled against Balsamo.  On January 2, 2008, the University President sent a letter to Balsamo informing him that he concurred with the determination of the grievance panel that there was no evidence of UNH policy violations, and the termination of Balsamo's employment would stand.  President's Letter, Doc. No. 14-35.  Balsamo did not appeal the President's ruling by petitioning the Chancellor.  Balsamo Dep. at 88-89, Doc. No. 14-7; OLPM Employee Complaint and Grievance Procedures Section § 12.3.1.8, Doc. No. 14-36.

**B.   Procedural History**

Balsamo brought suit in this court, asserting state law claims against his former employer, its president, and three of its employees for breach of contract, breach of the duty of good faith and fair dealing, wrongful discharge, and intentional interference with a contractual relationship.  He also alleged a

16

violation of his federal constitutional rights to due process, free speech, and equal protection.  Defendants brought a motion for judgment on the pleadings, which I granted in respect to Balsamo's claims for wrongful discharge, breach of the duty of good faith and fair dealing, intentional interference with a contractual relationship, and his free speech and equal protection claims.  Order, Doc. No. 12 .  I also granted defendants' motion with respect to Balsamo's breach of contract claim against the individual employees.  Id.

I allowed the breach of contract claim to proceed against the institutional defendants because, even though Balsamo had not identified the specific personnel policies that would create a contractual relationship between himself and his employer, his allegations were sufficiently particular to withstand dismissal at that early stage of the litigation.  Id. at 8-9.  I also allowed Balsamo's procedural due process claim to proceed based on the possibility that a contractual agreement had given Balsamo a property interest protected by the due process clause. Id. at 20-21.


## II.  **STANDARD OF REVIEW**

A summary judgment motion should be granted when the record reveals "no genuine dispute as to any material fact and that the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The evidence submitted in support of the motion must be considered in the light most favorable to the nonmoving party, drawing all reasonable inferences in its favor.  See Navarro v. Pfizer Corp., 261 F.3d 90, 94 (1st Cir. 2001).

A party seeking summary judgment must first identify the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The burden then shifts to the nonmoving party to "produce evidence on which a reasonable finder of fact, under the appropriate proof burden, could base a verdict for it; if that party cannot produce such evidence, the motion must be granted." Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 94 (1st Cir. 1996); see Celotex, 477 U.S. at 323.

### III.  <u>ANALYSIS</u>

Balsamo contends that UNH's adoption and dissemination of policies related to employment and employee termination gave rise to a contract between UNH and himself.  He argues that UNH breached the terms of that contract, as well as his constitutional due process rights, when it failed to accord him the procedural protections set out in its policies before terminating him.

18

Balsamo identifies a number of specific policies from the OLPM that he contends were not followed.  For example, he urges that UNH violated provisions of the Discrimination Policy by failing to properly investigate and adjudicate the complaints of discriminatory harassment lodged against him; failing to interview those who would vouch for his version of events; failing to provide him with a copy of a signed complaint detailing the charges against him; and failing to abide by the sixty day limitation for filing a complaint after an incident. He argues that even if he was terminated for poor performance rather than discriminatory harassment –- a fact that he contests –- UNH violated provisions of its Termination Policy by immediately terminating him for incidents that were not sufficiently egregious to qualify as serious grievous acts, and for terminating him without first taking evaluative steps and then imposing constructive discipline.

Regardless of whether UNH followed each of the policies implicated by Balsamo's contentions, I conclude that summary judgment is appropriate.  Balsamo was an at-will employee who had no contractual right to enforce UNH's policies.  The disclaimers present on the OLPM are sufficient to prevent its policies from acquiring contractual force, and Balsamo's arguments seeking to avoid the effect of those disclaimers are

19

unavailing.  Finally, because Balsam does not have a protected property interest in continued employment, his due process claim also necessarily fails.  I turn first to Balsamo's contract claim.

## A.  **Contract Claim**

### 1.  **Legal Background**

Under New Hampshire law, "the at-will status of an employment relationship is one of *prima facie* construction." Butler v. Walker Power, Inc., 137 N.H. 432, 435 (1993) (citation and internal quotation marks omitted); see Panto v. Moore Bus. Forms, Inc., 130 N.H. 730, 739 (1988).  Stated differently, when an employment relationship does not explicitly provide for a definite duration, it is presumed to be at-will.  Butler, 137 N.H. at 435.  Absent the violation of a statute, collective bargaining agreement, or aspect of public policy, an employer may discharge an at-will employee at any time for any reason. Lowry v. Cabletron Sys., Inc., 973 F. Supp. 77, 83 (D.N.H. 1997) (quoting Smith v. F.W. Morse & Co., 76 F.3d 413, 426 (1st Cir. 1996)).

The at-will status of an employment relationship can be altered by contract.  For example, an employer's promulgation of an employee handbook or policy statement to its employee may constitute a unilateral contract offer that the employee accepts

by continuing to work at his job. Panto, 130 N.H. at 736-37. Such a contract can create obligations that limit or qualify the employer's ability to discharge the employee. See id. Standard principles of contract formation govern the creation of such contracts, and objective standards will determine the existence of a contract. Panto, 130 N.H. at 735-36, 741-42; see also F.W. Morse, 76 F.3d at 426 (1st Cir. 1996).

An employer who seeks to avoid creating an employment contract can do so via a written disclaimer in the handbook or policy that indicates that the document will not create contractual obligations. Panto, 130 N.H. at 742. Under the reasoning of the New Hampshire Supreme Court's decision in Butler v. Walker Power, however, the mere existence of a disclaimer does not automatically prevent all of a document's individual terms and policies from becoming enforceable features. See 137 N.H. at 436. For example, a general disclaimer that applies only to the "contract of employment" may prevent the creation of a durational employment relationship, but the handbook or policy may still create binding contractual obligations regarding the incidents of employment -- such as compensation and fringe benefits –- to the extent that the incidents themselves are not disclaimed. Id. at 436-37.

## 2.   <u>The Online Policy Manual and its Disclaimers</u>

The disclaimers on the OLPM are sufficient to prevent the creation of an employment contract between UNH[3] and Balsamo based on that online manual.  Both the menu-page disclaimer and the disclaimer that appears on the top of each policy page state clearly that the OLPM is not an employment contract.

Furthermore, the disclaimers are sufficiently particular to avoid the issue in <u>Butler</u>, where a generic disclaimer kept the employment relationship at-will but was not specific enough to prevent the individual policies in the handbook from becoming contractually binding as the incidents of an at-will employment relationship.  <u>See</u> 137 N.H. at 436-437.  In this case, the menu-page disclaimer specifically notes that the OLPM "cannot be construed to establish rights beyond those provided for in the official and current policies of USNH," (OLPM Main Menu, Doc. No. 16-6) and each policy page states that the "policies may be amended at any time, [and] do not constitute an employment contract" (e.g., Termination Section, Doc. No 14-12). Together, the language of the disclaimers is sufficient to cover not only

---

[3] From this point forward, I refer to UNH and USNH collectively as "UNH," as neither party distinguishes between the two institutional defendants.

the durational aspect of the employment relationship,[4] but also
the incidents of employment contained in the individual
policies.  Moreover, the fact that the disclaimer is included on
each policy described in the OLPM puts the reader on further
notice that none of the policies give rise to enforceable
contractual obligations.

Balsamo only briefly contests the effectiveness of the
disclaimers, asserting that their language is "at best ambiguous
and should be construed against Defendants."  P.'s Opp'n to
Summ. J. at 15, Doc. No. 16-1.  I do not see ambiguity,[5] and

---

[4] Balsamo cursorily asserts that the disclaimers do not apply to
the policies, found in the Appointments and Employment
Relationships Section of the OLPM, that specifically implicate a
durational component to UNH's status appointment hiring.  See
Employment Section § 6.2.4.1, Doc. No. 16-5 ("A status
appointment is normally reserved for those with continued
employment expectations . . . ."); id. § 6.2.5 ("Appointments
are based on a Fiscal Year, which is 12 consecutive months . . .
or on an academic year of approximately nine months . . . .").
Aside from failing to offer either precedent or argument in
support of his contention, Balsamo fails to acknowledge that one
of the very provisions to which he cites contains yet another
disclaimer, which states, "A status appointment . . . shall not
be construed to imply a commitment or a contractual obligation
to provide employment."  Id. § 6.2.4.1.

[5] In my previous opinion, I stated that the language of the menu-
page disclaimer was ambiguous because it was not clear whether
it disclaimed the individual policies themselves or merely the
online compilation of the policies.  Order at 10-11, Doc. No.
12.  In light of the evidence in front of me at this stage --
notably the disclaimer on each policy page and Balsamo's failure
to present a source of policies separate from the OLPM -- that
ambiguity has been dispelled.

Balsamo fails to meaningfully develop his claim that the disclaimers are ineffective or of insufficient breadth to cover all the OLPM policies.  Balsamo focuses instead on arguments that attempt to circumvent the effect of the disclaimers. First, he argues that the OLPM is merely a compilation of actual, official policies, and that even if the OLPM does not give him rights as an employee, the official policies do bestow such rights.  Second, he contends that contractual rights arose from documents UNH provided to him that recite certain UNH policies set forth in the OLPM but do not contain the disclaimers that are present in the OLPM.  I address each argument in turn.

> (a)  **Existence of Actual Policies Outside of OLPM**

Balsamo's first claim is premised on the notion that the OLPM is a mere representation of actual policies that exist in some other official document.  He then argues that the other official document gives him enforceable contractual rights.  As support for this idea, Balsamo draws attention to the OLPM menu-page disclaimer, which states that the OLPM "cannot be construed to establish rights **beyond those provided for in the official and current policies of USNH."**  OLPM Main Menu, Doc. No. 16-6 (emphasis added).  He also points to the Handbook, whose

---

disclaimer states, "While the handbook summarizes plans,
programs, and policies, **the exact terms of the written documents
for these plans, programs, and policies take precedent** [sic]."
Handbook at 2, Doc. No. 14-18.  Based on these references to
"official [] policies" and "written documents" that exist apart
from the Handbook and the OLPM, Balsamo reasons that even if the
OLPM, as a medium for compiling and disseminating the official
policies, does not create employment rights, his at-will
relationship has nonetheless been modified by the official
policies themselves, as they exist in some other official
document.[6]

     Balsamo has failed, however, to produce any official policy
document other than the OLPM.  This is likely because, as the
Secretary and General Counsel of the University System explains,
the OLPM has been the only policy manual used by UNH since 1989,

---

[6] In a similar vein, Balsamo argues that the official and actual
policies adopted by the UNH Board "have the force of law and are
bi[n]ding upon the parties."  P.'s Opp'n to Summ. J. at 14, Doc.
No. 16-1.  He contends that because UNH is a creature of
statute, see N.H. Rev. Stat. Ann. § 187-A:3, and because the
trustees of UNH have the statutory authority to promulgate
certain rules, see id. § 187-A:16, each of UNH's policies,
irrespective of UNH's means of dissemination or use of
disclaimers, must therefore be a legally binding government
rule.  I disagree.  UNH's status as a public university does not
prevent it from hiring at-will employees.  No case or statute
cited by Balsamo supports his contention that UNH is prevented
from formulating policies that do not give rise to contractual
obligations.

when the University began the practice of using an online manual without any hardcopy version.  Rogers Aff. ¶ 4, Doc. No. 17-6. Without any evidence supporting his argument, I cannot sustain Balsamo's claim.  See Meuser v. Fed. Express Corp., 564 F.3d 507, 515 (1st Cir. 2009) ("[T]he non-moving party must offer definite, competent evidence to rebut the [summary judgment] motion.").

(**b**)  **Hardcopy Reproductions without Disclaimers**

Balsamo's second argument is based on his receipt of hardcopies of UNH policies without the OLPM disclaimers. Shortly after Balsamo was hired, he received a copy of the Discrimination Policy, and after he was discharged and filed his grievance he received copies of UNH's policies on Termination, Discrimination, and the Family and Medical Leave Act.  In light of the circumstances of their dissemination to Balsamo, these documents were incapable of creating contractual obligations.

I first address the policy hardcopies that Vilmarie Sanchez sent to Balsamo in response to his filing of the grievance. These documents were provided to Balsamo after his employment had been terminated.  Therefore, the consideration that is typical in cases where an employer handbook or policy document is construed as an offer to contract -- continued service by the employee -- is not present.  See Panto, 130 N.H. at 736.

26

"Consideration is essential to all contracts," Chasan v. Vill. Dist. of Eastman, 128 N.H. 807, 816 (1986), and Balsamo has not asserted an alternate theory of consideration.

Moreover, Balsamo received the copies of the policies in response to his letter citing those policies.  Clearly, he was already familiar with the policies from the OLPM, where they were accompanied by disclaimers.  That UNH reproduced those policies without disclaimers and sent them to Balsamo does not indicate that UNH then intended to be bound by policies it had previously declared in the OLPM to be nonbinding.  A person in Balsamo's position could not have reasonably understood UNH's sending of those copies, after he had been terminated and in response to his grievance, to be an offer to contract.  See id. at 815 (explaining how an offer must create a reasonable expectation that contractual obligations will result).

I next turn to the hardcopy of the Discrimination Policy that Balsamo received around the time his employment began.  The dissemination of that policy also is incapable of supporting a breach of contract claim.  Although the hardcopy of the policy did not have the disclaimers present in the OLPM, just under its title the document stated: "The section references in this policy correspond to the [OLPM], which contains this Discrimination and Discriminatory Harassment Policy as adopted

27

by [UNH].  This policy may be found on-line at [OLPM website address]."  Discriminatory Harassment Packet at 8, Doc. No. 14-9.  In addition to that note directing attention to the OLPM, the Handbook given to Balsamo at the start of his employment also directed employees to look to the OLPM for more specific information about UNH policies.  Had Balsamo looked to the OLPM as the policy copy and the Handbook instructed, he would have seen the disclaimers indicating that the policies would neither establish rights nor create an employment contract.  Furthermore, notwithstanding the procedures set out in the Discrimination Policy, the Handbook, which Balsamo acknowledged reading and understanding, explicitly stated that UNH "reserves the right to . . . terminate a staff member immediately if, in its sole judgment, the nature of the situation justifies immediate termination."

In sum, Balsamo knew, or should have known, of the disclaimers on the OLPM; he knew, or should have known, that the hardcopy of the policy he received was identical in substance to the corresponding OLPM section; and he knew that UNH reserved the right to immediately terminate his employment.  He could not reasonably have interpreted receipt of a hardcopy of the Discrimination Policy as a contractual offer that would vest him

with procedural rights in the event discrimination complaints were lodged against him.  See Panto, 130 N.H. at 74.

## B.   **Procedural Due Process**

"The test for a procedural due process violation requires the plaintiff[] to show first, a deprivation of a protected property interest, and second, a denial of due process." Perez-Acevedo v. Rivero-Cubano, 520 F.3d 26, 30 (1st Cir. 2008).  To have a protected property interest in a benefit, a person "must have more than a unilateral expectation of it." Bd. of Regents of State Coll. v. Roth, 408 U.S. 564, 577 (1972).  In the employment context, an employee must have a "legitimate claim of entitlement to continued employment." Perry v. Sindermann, 408 U.S. 593, 602 (1972).

Balsamo has not presented evidence of a legitimate claim to continued employment other than by citing to the policies discussed at length above.[7]  As I have explained, those policies did not create contractual obligations and did not alter the status of Balsamo's at-will employment relationship.  As an at-will employee, Balsamo could be fired at any time with or without cause. Lowry, 973 F. Supp. at 83.  Accordingly, Balsamo

---

[7] Although Balsamo frames his argument in alternative formats, the gist of each claim is that the policies set out in the OLPM and reproduced elsewhere vested him with rights that an at-will employee would not possess.

had no protected property interest in continued employment and

his procedural due process claim must therefore fail.[8]  Ayala-

Rodriguez v. Rullan, 511 F.3d 232, 238 (1st Cir. 2007) (at-will

employment contract does not create property interest protected

by the due process clause).


## IV.   CONCLUSION

     Defendants' motion for summary judgment (Doc. No. 14) is

granted.[9]   The clerk is directed to enter judgment accordingly

and close the case.

     SO ORDERED.

                              /s/Paul Barbadoro
                              Paul Barbadoro
                              United States District Judge
March 2, 2012


cc:  James E. Lafrance, Esq.
     Jeremy David Eggleton, Esq.
     Martha Van Oot, Esq.

---

[8]    Balsamo does not argue that he has a protected liberty
interest to a name clearing hearing.  See, e.g., Burton v.
Littleton, 426 F.3d 9, 15 (1st Cir. 2005).  Accordingly, I do
not consider whether he has a viable due process claim based on
the deprivation of a liberty interest.

[9] In light of my disposition of this case, I deny as moot
defendants' motion to strike three exhibits that were submitted
by Balsamo along with his objection (Doc. No. 19).  I have
considered all of the materials offered by Balsamo, and the
outcome of this case is unaffected by the contested exhibits.